## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ELLEN E. WEBER,                )
                                        )    **No. 15 CV 1233**
                   **Plaintiff,**   )
                                          )
     **v.**                              )    **Magistrate Judge Young B. Kim**
                                          )
CAROLYN W. COLVIN, Acting    )
Commissioner, Social Security    )
Administration,                        )
                                          )    **October 11, 2016**
                    **Defendant.**   )

## MEMORANDUM OPINION and ORDER

Ellen Weber applied for disability insurance benefits ("DIB") alleging that she is disabled by multiple sclerosis ("MS"). After the Commissioner of the Social Security Administration ("SSA") denied her application, Weber filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court is Weber's motion for summary judgment. For the following reasons, the motion is denied and the Commissioner's final decision is affirmed:

### Procedural History

Weber applied for DIB in August 2011, alleging a disability onset date of June 1, 2011. (Administrative Record ("A.R.") 111-13, 131-37.) After her claim was denied initially and again upon reconsideration, (id. at 70-71), Weber requested and was granted a hearing before an Administrative Law Judge ("ALJ"), which took place on September 5, 2013, (id. at 33-69, 82-83). Weber was not represented by an attorney at the hearing. (Id. at 35.) On September 13, 2013, the ALJ issued a

decision finding that Weber is not disabled and thus not entitled to DIB. (Id. at 15-28.) When the Appeals Council declined review, (id. at 1-3), the ALJ's decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Weber filed this action seeking judicial review, (R.1); *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R.7); *see* 28 U.S.C. § 636(c).

## Background

Prior to her alleged onset date, Weber taught ice skating and worked in retail. Weber says that her MS causes her to have chronic pain, fatigue, and numbness, which prevent her from working. She was 48 years old at the time of her hearing before the ALJ, where she presented both documentary and testimonial evidence in support of her DIB application.

## A. Medical Records

Weber saw neurologist Dr. Daniel Wynn twice a year from December 2005 through June 2012 for treatment of her relapsing-remitting MS. Dr. Wynn's notes from July 2006 through her alleged onset date in June 2011 generally record no symptoms to suggest an MS relapse, although Weber once reported increased fatigue and numbness in June 2009. (A.R. 219-22, 226-27, 229.) In June 2011, Weber's records show that she had been in Greece for eight days and reported no new or different symptoms to indicate an MS relapse. (Id. at 218.)

In October 2011, Dr. Mahesh Shah conducted an internal medicine consultative examination for the Bureau of Disability Determination Services

("DDS"). (Id. at 235.) Dr. Shah noted that Weber received Betaseron injections for five years after first being diagnosed with MS around 2001, but when they became less effective, she started taking Rebif instead and was "doing better" on Rebif. (Id.; see also id. at 283.) Dr. Shah reported that Weber's MS symptoms had stabilized, although she still complained of numbness in her extremities and said she could not ice skate, run, or go on long trips. (Id. at 235.) Upon examination, Dr. Shah observed that Weber walked and moved around without much difficulty. (Id. at 236.) He further noted that Weber had full range of motion in all the joints of her upper and lower extremities, a normal gait, normal fine and gross manipulations, and normal handgrip and finger grasps. (Id. at 237.) Dr. Shah observed that Weber's deep tendon reflexes were exaggerated in the right upper extremity, and that Weber had numbness in the right upper and lower extremities. (Id. at 238.) However, her motor strength was 5/5 in both upper and lower extremities. (Id.) According to Dr. Shah, Weber's memory, behavior, and ability to relate during the examination were all within normal limits. (Id.) He concluded that while Weber has mild numbness in her right extremities and cannot perform strenuous activities, she is fairly functional at home. (Id.)

Later in October 2011, state agency consultant Dr. James Hinchen reviewed Weber's medical file, including Dr. Shah's report, and concluded that Weber's MS is non-severe and does not pose more than a minimal limitation in her ability to engage in work-related activities. (Id. at 242.) Another state agency consultant, Dr. Richard Bilinsky, affirmed Dr. Hinchen's opinion in January 2012. (Id. at 280.)

At the request of Weber's neurologist, psychologist Michael DiDomenico, Psy.D. examined Weber and completed a comprehensive neuropsychological report in January 2012. (Id. at 283-90.) He observed, among other things, that Weber walked without assistance but exhibited slowed movement and thought processes. (Id. at 284.) He noted that she was goal oriented and had "adequate" task persistence, motivation, and initiative, but was "quite fatigued by the end of the assessment process." (Id.) Dr. DiDomenico reported that Weber had difficulty with non-verbal and speed-dependent tasks. (Id. at 286.)

As for attention and concentration, Dr. DiDomenico observed that Weber's mental control "was grossly within functional limits," although she was easily distracted and had problems with more difficult tasks. (Id.) He also noted that Weber's memory functions were compromised, suggesting "a decline from premorbid levels." (Id.) Her visual-spatial skills were "grossly functional" and she demonstrated "adequate verbal comprehension and expression," although she did have difficulty finding certain words to complete her thoughts. (Id. at 287.) Dr. DiDomenico observed that Weber had symptoms of depression and might be experiencing symptoms of anxiety. (Id. at 288.) He concluded that Weber "is a viable candidate for long-term disability" and that she would have difficulty with speed-dependent tasks, has deficits in attention, concentration, short-term memory and language retrieval, and is prone to react under stress. (Id. at 288-89.)

In February 2012, Dr. Wynn noted that Dr. DiDomenico's report confirmed his impression that Weber is unable to work. (Id. at 296.) Dr. Wynn also referred

to MRI findings not included in the record which "correlated" with Dr. DiDomenico's report. (Id.) During a June 2012 visit, Weber reported joint pain, back pain, cough, numbness, weakness, shortness of breath, and visual loss. (Id. at 295.) Dr. Wynn noted sensory, visual, and coordination abnormalities, but wrote that other neurological markers were within normal limits. (Id.) He also noted "no new MS symptoms." (Id. at 293.) At Weber's next visit in December 2012, she continued to report joint pain, cough, numbness, weakness, and shortness of breath, and Dr. Wynn noted visual, sensory, coordination, and deep tendon reflex abnormalities, but wrote that other neurological markers were within normal limits. (Id. at 292.) He reported there were "zero changes" in Weber's symptoms since her last visit, but that she felt "run down." (Id. at 291.) He remarked that she "did well" on a recent trip to Mexico and was tolerating Rebif well. (Id.)

## B.    Hearing Testimony

At her hearing before an ALJ on September 5, 2013, Weber appeared without an attorney. (A.R. 35.) The ALJ referred to the hearing notice that was sent to Weber informing her of her right to be represented by an attorney, and the ALJ advised her that she might qualify for free legal assistance. (Id. at 35-36.) The ALJ also told Weber that she could retain a private attorney on a contingency fee basis, and that the lawyer would be paid up to 25 percent of any benefits awarded or $6,000, whichever is less. (Id. at 36.) When asked whether she wanted more time to get a representative or to proceed without representation, Weber said she wanted to proceed. (Id.) The ALJ asked Weber whether she had reviewed the documents

included in the electronic case file and whether she had any other documents to add.  (Id. at 37.)  Weber mentioned that Dr. DiDomenico's report was initially excluded, but the ALJ confirmed that the report was now in the record.  (Id. at 38.)  The ALJ noted that she would keep the record open after the hearing if Weber had any additional documents to submit.  (Id.)

Weber testified that she last worked in 2006 teaching ice skating, but that she stopped working because numbness in her foot interfered with driving.  (Id. at 40-41.)  She also worked in a gift shop, but she said she was fired after taking a leave of absence for an MS exacerbation.  (Id. at 41-42.)  Weber explained that at any rate, she could not return to her work in the gift shop because it is not always easy to get out of bed and because she might not be able to drive on any given day.  (See id. at 42.)  She also said she would have trouble working full time because she is unable to sit or stand for very long, and that hot days prevent her from walking.  (Id. at 43, 44.)

Weber further testified that she was never hospitalized for any MS exacerbations since her alleged onset date and that Rebif has reduced the frequency of her exacerbations.  (Id. at 45-46.)  She reported that side effects from her medication are "not too bad."  (Id. at 50.)  She said that she still experiences milder exacerbations on hot days, during which she has increased numbness and fatigue, worsened vision, and increased difficulty walking and doing household chores.  (Id. at 46-47, 49-50.)  According to Weber, exacerbations occur whenever the weather is hot, and that even in the winter she "might" go a month without an exacerbation.

(Id. at 49.)  She testified that during even mild exacerbations she would "go down like a week at a time" during which she is unable to walk, cook, or clean the house. (Id. at 47.)  But she explained that air conditioning and a dehumidifier help relieve her symptoms to some extent.  (Id. at 49.)  Weber also testified that even when she is not experiencing an exacerbation, she has numbness in her hands, feet, right leg, and sometimes her right hip.  (Id. at 48.)  She said she can only walk two to three blocks, stand for 20 minutes, and sit for an hour at a time, but can lift 40 pound bags of salt.  (Id. at 51.)

As for daily activities, Weber testified that she drives once or twice a week, usually to the drug store.  (Id. at 40.)  She lets her dogs out, "picks up the yard" if necessary, waters her garden, does laundry, bathes and dresses herself, cooks some meals, vacuums, showers the dogs, and pays bills.  (Id. at 52-54.)  She exercises in a seated machine three times a week for about 30 minutes to an hour at a time.  (Id. at 53-54.)

The ALJ inquired about Weber's recent trips to Greece, Mexico, and the Caribbean.  Weber said that she went to Greece for eight days around the time of her alleged onset date with her husband.  (Id. at 56.)  She said that it was hot there and she did some walking, but that they spent most of their time on a cruise ship. (Id. at 56-57.)  Then Weber testified that she and her husband went to Mexico in December 2012 for three days, during which she avoided being out in the sun.  (Id. at 57.)  In March 2013, Weber and her husband went on a cruise to the Caribbean

for six days. (Id. at 58.) She said that they did very little walking around and mostly stayed on the ship. (Id.)

Weber's husband also testified at the hearing. He told the ALJ that Weber's ability to drive and "handle relatively simple things during the day" had deteriorated in the last few years. (Id. at 60.) When asked whether he thought Weber could be a ticket taker at a theater, he responded that she would have trouble driving to that job. (Id. at 60-61.)

## C.  Vocational Expert Testimony

The vocational expert ("VE") testified at the hearing that Weber's past employment included work as a merchandise coordinator, ice skating instructor, and part-time music teacher. (A.R. 66.) The ALJ asked the VE whether an individual of Weber's age and background who can sit for six to eight hours a day, stand and walk at least six hours, frequently lift and carry up to 25 pounds, occasionally lift and carry up to 50 pounds, and who is limited to simple and routine jobs with routine changes only, would be able to perform Weber's previous work. (Id.) The VE responded that such a person would be unable to perform Weber's prior positions, but could work as an assembler, cleaner, or bagger. (Id. at 67.) The ALJ then asked what jobs would be available for an individual restricted to light work who could only occasionally stoop, crawl, climb, crouch, kneel, and balance. (Id.) The VE responded that such a person could work as an assembler, inspector, or cleaner. (Id. at 67-68.)

**D. The ALJ's Decision**

The ALJ evaluated Weber's claims under the required five-step evaluation process for determining whether a claimant is disabled. See 20 C.F.R. § 404.1520(a). As an initial matter, the ALJ determined that Weber met the insured status requirements of the Social Security Act through September 30, 2012. (A.R. 20.) At step one the ALJ found that Weber did not engage in substantial gainful activity during the period from her alleged onset date through her date last insured. (Id.) At step two the ALJ found that Weber had the severe impairments of MS and cognitive disorder. (Id.) At step three the ALJ determined that Weber did not have an impairment or a combination of impairments that meet or medically equal a listed impairment. (Id. at 21-22.) Before step four, the ALJ determined that Weber had the residual functional capacity ("RFC") to perform light work except that she can only occasionally stoop, kneel, crouch, crawl, and balance, and she is limited to simple, routine tasks involving only routine changes. (Id. at 22.) At step four, the ALJ determined that Weber would be unable to perform any past relevant work. (Id.) But at step five, the ALJ found that Weber could perform jobs existing in significant numbers in the national economy, such as assembler, inspector, or a maid/housekeeper. (Id. at 28.) Accordingly, the ALJ concluded that Weber is not disabled. (Id.)

## Analysis

Weber raises several challenges to the ALJ's decision. First, she contends that the ALJ did not obtain a valid waiver of counsel and failed to develop a full and

fair record.  (R. 12, Pl.'s Mem. at 7-11.)  Second, Weber argues that the ALJ did not give proper consideration to Dr. DiDomenico's opinion.  (Id. at 11-12.)  Third, Weber argues that the ALJ's RFC assessment fails to account for all of her physical and mental limitations.  (Id. at 12-13.)  Fourth, she contends that the RFC is premised upon an improper adverse credibility determination.  (Id. at 13-14.)  Finally, Weber contends that the hypotheticals the ALJ posed to the VE did not accurately reflect the facts in the record.  (Id. at 14.)

This court's review of the ALJ's decision is "extremely limited," asking only whether the decision is free of legal error and supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quotations and citations omitted).  Because the court's role is neither to reweigh the evidence nor to substitute its own judgment for the ALJ's, if the ALJ's decision is adequately supported and explained it must be upheld even where "reasonable minds can differ over whether the applicant is disabled." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).  In order to adequately support the decision, the ALJ must build "an accurate and logical bridge from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (internal quotation omitted).

## A.     Waiver of Counsel

Weber first argues that the ALJ did not properly obtain a waiver of counsel and did not develop a full and fair record.  (R. 12, Pl.'s Mem. at 7.)  It is well

established that in disability hearings, a claimant has a statutory right to counsel. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994) (citing 42 U.S.C. § 406 and 20 C.F.R. § 404.1700). If properly informed of the right, a claimant may waive her right to counsel. *See id.* (citing *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991)). To ensure a valid waiver of counsel, the Seventh Circuit requires that the ALJ explain to the claimant of the following: (1) the manner in which an attorney can aid in the proceedings; (2) the possibility of free counsel or a contingency arrangement; and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees. *Thompson*, 933 F.2d at 584. Here, the ALJ apprised Weber of the possibility of free legal counsel or a contingency arrangement and informed her of the limits placed on attorney fees. (A.R. 36.) However, the ALJ did not orally explain how an attorney could assist her in her case. The record does contain Weber's written acknowledgement that she received a notice prior to the hearing, which included a form explaining the benefits of counsel. (Id. at 90, 107.)

The Seventh Circuit has not directly addressed whether a claimant's receipt of written materials setting forth the information required by *Thompson* can replace an ALJ's oral explanation. *See Davila v. Colvin*, No. 14 CV 2743, 2015 WL 3952868, at *6 (N.D. Ill. June 29, 2015) (collecting cases); *see also Wartak v. Colvin*, No. 14 CV 401, 2016 WL 880945, at *4 (N.D. Ind. March 8, 2016). Some trial courts have found that written notice is sufficient, *see, e.g., Moore v. Astrue*, 851 F. Supp. 2d 1131, 1141 (N.D. Ill. 2012); *Tuggle v. Colvin*, No. 15 CV 70, 2016 WL 1237369, at *2

(S.D. Ind. March 30, 2016), while others have held that the claimant's receipt of a pre-hearing notice by itself does not relieve the ALJ of the obligation to properly notify the claimant of the right to counsel at the hearing, *see, e.g., McCaster v. Colvin*, No. 12 CV 4059, 2014 WL 2158967, at *7 (N.D. Ill. May 23, 2014); *Dillard v. Barnhart*, No. 02 CV 6251, 2003 WL 22478775, at *2 (N.D. Ill. Oct. 31, 2003). It is therefore unclear whether Weber's acknowledged receipt of written notice constituted a valid waiver of counsel.

However, the court need not decide in this case whether an ALJ can discharge her obligation to obtain a valid waiver of counsel through pre-hearing notices because a claimant is not entitled to a remand based on an invalid waiver unless the ALJ failed to develop a full and fair record. *See Binion*, 13 F.3d at 245 (citation omitted). When a claimant appears without counsel, the ALJ must "scrupulously and conscientiously [] probe into, inquire of, and explore for all the relevant facts." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (citations and internal quotations omitted). *Pro se* litigants must furnish some medical evidence to support their claim, and the ALJ is required to supplement the record as necessary by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information. *Id.* (citations omitted). The court will generally uphold the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation. *See Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994); *Binion*, 13 F.3d at 246. Accordingly, a significant, prejudicial omission is

usually required before the court will find that the Commissioner failed to assist a *pro se* claimant in developing the record fully and fairly. *See Luna*, 22 F.3d at 692; *Nelson*, 131 F.3d at 1235. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion*, 13 F.3d at 246. Instead, a claimant must set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider. *Nelson*, 131 F.3d at 1235.

Here, Weber points out ways that an attorney could have clarified her testimony or advocated on her behalf. (R. 12, Pl.'s Mem. at 9.) She also contends that an attorney would have asked the ALJ to seek medical expert testimony and would have ensured that "all relevant information made its way into the [r]ecord." (Id.) Furthermore, Weber takes issue with the ALJ's tone and manner of questioning during the hearing, which she claims put her at a disadvantage because she lacked counsel. (Id. at 9-10.) But these general assertions and vague conjectures as to the additional evidence and advantages Weber might have gained with counsel are insufficient to warrant remand, and Weber does not put forth any specific, relevant facts or evidence that the ALJ failed to consider.

The ALJ obtained records from each of Weber's treating physicians as well as from DDS and state agency consultants, and she elicited detailed testimony from Weber regarding her employment history, medical evidence, medication, symptoms, limitations, and daily activities at the hearing. (See A.R. 37-59.) The ALJ also heard testimony from Weber's husband, and left the record open for any additional documents Weber might want to submit after the hearing. (Id. at 37-38, 60-65); *see*

*Binion*, 13 F.3d at 245 (finding ALJ fully and fairly developed the record in similar circumstances).  The court thus finds that the ALJ adequately developed the record here, and remand is not necessary on that basis.

**B.  Dr. DiDomenico's Medical Opinion**

Next, Weber argues that the ALJ did not give proper consideration to the opinion of Dr. DiDomenico, an examining psychologist.  (R. 12, Pl.'s Mem. at 11.)  "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."  *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  After providing a detailed summary of Dr. DiDomenico's January 2012 evaluation findings, the ALJ concluded that she would give his opinion weight "only to the extent it supports a conclusion that the claimant is limited to simple, routine work, and is thereby precluded from performing her prior skilled work."  (A.R. 26.)  She also declined to give weight to Dr. DiDomenico's opinion that Weber "appears to be a viable candidate for long-term disability."  (Id.)  The ALJ adequately supported her reasoning here.  She explained that the report makes "repeated reference to a decline from premorbid levels of functioning" and that "subtests generally revealed difficulties primarily with . . . more complex tasks."  (Id.)  Indeed, Dr. DiDomenico found that Weber had "adequate" or generally functional language skills, mental control, visual-spatial skills, simple arithmetic abilities, common-sense reasoning, social judgment, vocabulary, word usage, and verbal comprehension.  (Id. at 284-87.)  The ALJ also found that although Dr. DiDomenico noted sluggishness in

Weber's speech, none of her treating or consulting physicians made the same observation and she "was able to interact appropriately at the hearing." (Id. at 26.) Finally, after giving proper consideration to Dr. DiDomenico's detailed report, the ALJ accurately pointed out that whether a claimant is "disabled" for DIB purposes is an issue reserved for the Commissioner. (Id.); *see* 20 C.F.R. § 404.1527(d)(1); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("[A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work."). Accordingly, the court finds that the ALJ did not err in weighing Dr. DiDomenico's opinion.

## C.    RFC Assessment

Weber further contends that the ALJ did not properly consider her physical and mental impairments in assessing her RFC. (R. 12, Pl.'s Mem. at 12-14.) Regarding her physical impairments, Weber argues that the ALJ's assessment that she can occasionally stoop, kneel, crouch, and crawl "seems to have been plucked out of thin air." (Id. at 12.) But the ALJ explained that she based that limitation on Weber's "reports of subjective weakness and fatigue[.]" (A.R. 26.) Even if the ALJ erred by failing to provide a more detailed explanation, Weber points to no evidence or testimony indicating that she has more postural limitations than the ALJ assessed. *See Schreiber v. Colvin*, 519 Fed. Appx. 951, 962 (7th Cir. 2013). Indeed, Weber demonstrated no problems with movement during her consultative examination with Dr. Shah and had full range of motion in all joints. (A.R. 236-37.)

As for her mental impairments, Weber argues that because she is "significantly limited in her cognitive abilities," she would be incapable of performing even the "simple, routine, and repetitive tasks" included in her RFC assessment. (R. 12, Pl.'s Mem. at 13.) In support of that contention, she points to her alleged "difficulty responding to questions at the hearing" and to Dr. DiDomenico's report. (Id.) But as already discussed above, the ALJ gave proper consideration to Dr. DiDomenico's findings and adequately substantiated her determination that his report did not preclude simple, routine, and repetitive tasks. (See A.R. 26.) Regarding Weber's hearing testimony, besides asserting that she was "agitated" and accusing the ALJ of having an adversarial tone, Weber does not specify what difficulties she had at the hearing that would support her alleged inability to perform unskilled work. (See R. 12, Pl.'s Mem. at 8-10.) The hearing transcript does not provide evidence of any obvious cognitive difficulties to corroborate her claim. Furthermore, the ALJ observed that Weber "was able to interact appropriately at the hearing," (see A.R. 26), and the court affords the ALJ's subjective assessment substantial deference because it is based on the kind of intangible elements that only the ALJ is in a position to observe, *see Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999); *see also Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).

Weber makes passing reference to the fact that the ALJ found her to be moderately limited in concentration, persistence, and pace at step three of her analysis, which Weber says the ALJ did not properly consider in her RFC

assessment. (R. 12, Pl.'s Mem. at 13.) As an initial matter, Weber fails to develop her argument on this point. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived."). Furthermore, the ALJ explained that she found Weber moderately limited in concentration, persistence, and pace because the record shows she has "some difficulties with respect to complex concepts and tasks," but that she still has generally "intact functioning with respect to simple tasks[.]" (A.R. 21.) While restricting a claimant to simple, routine tasks often does not adequately capture limitations in concentration, persistence, and pace, *see Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015) (citing *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014)), here the ALJ built a logical bridge between her finding that Weber is moderately limited and the accommodation of unskilled work. The ALJ explicitly linked Weber's moderate limitations in concentration, persistence, and pace to her difficulties with complex tasks described in Dr. DiDomenico's report. (See A.R. 21.) In the category of attention and concentration, Dr. DiDomenico noted that Weber's mental control "was grossly within functional limits" and that her task persistence was "adequate," but that she struggled with sustained attention as tasks became more difficult. (Id. at 284, 286.) He observed deficits on tasks that "load *heavily* upon attention, concentration, short term memory and certain aspects of language," (id. at 289 (emphasis added)), but he also reported that Weber demonstrated at least "adequate" or functional abilities in spontaneity, initiative, mental control, simple arithmetic, verbal-spatial skills, language skills, common-sense reasoning, social

judgment, vocabulary, word usage, and verbal comprehension and expression, (id. at 284-87). These observations are not inconsistent with the ALJ's conclusion that Weber's difficulties stem from the performance of complex tasks, and that limiting Weber to simple, routine work adequately addresses those difficulties. *See Capman v. Colvin*, 617 Fed. Appx. 575, 579 (7th Cir. 2015) (holding RFC preventing claimant from working in proximity with others "adequately addressed [claimant's] deficiencies in concentration, persistence, and pace" because they "stem[med] from [claimant's] anxiety attacks" caused by proximity). Finally, Weber points to no evidence or testimony indicating that she is limited in concentration, persistence, and pace beyond the level the ALJ assessed. *See Schreiber*, 519 Fed. Appx. at 962. The court therefore finds no basis for remand in the ALJ's RFC analysis.

## D.    Credibility Assessment

Weber next argues that the ALJ rendered an erroneous credibility determination[1] that negatively impacted her RFC assessment. (R. 12, Pl.'s Mem. at 13-14.) The court disagrees. The ALJ found Weber's testimony "not fully credible" because the medical record does not support the limitations she alleges and because the ALJ deemed Weber's activities of daily living to be inconsistent with her symptom allegations. (Id. at 25-26.) First, Weber testified at the hearing that she

---

[1]    The SSA recently issued an SSR updating its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new SSR 16-3p supersedes SSR 96-7p, eliminating the term "credibility" from the Administration's sub-regulatory policies in favor of a focus on symptom evaluation. *Id.* at *1. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character," but they "will continue to assess the credibility of pain *assertions* by applicants." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

suffers from exacerbations whenever the weather is hot and indicated that even in the winter she "might" go only a month without an exacerbation. (Id. at 49.) She also said that during even mild exacerbations she would "go down like a week at a time" during which she could not walk, cook, or clean the house. (Id. at 47.) On the other hand, Weber testified that if "things are just going along" and she is not suffering from an exacerbation, she only sees her neurologist twice a year. (Id. at 45-46.) As the ALJ pointed out, despite her testimony indicating that she suffers incapacitating exacerbations with some regularity, the record shows that throughout her treatment history Weber still only saw her neurologist twice a year. (See, e.g., id. at 218, 220, 291, 293, 296, 298.) And during those routine visits, Weber generally reported no new or worsening symptoms from MS and no difficulties or side effects with her medication. (See id.) The medical record thus does not corroborate that Weber suffered from regular exacerbations. Furthermore, Weber testified that she can only walk two to three blocks at a time and her husband testified that she "limps a lot," (id. at 51, 61), but as the ALJ noted, she demonstrated full motor strength on examination and her examining physicians reported that her gait was normal and she could walk without any assistance, (id. at 23, 25-26). Accordingly, the ALJ was not patently wrong to conclude that the medical record does not support Weber's symptom allegations. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (credibility determination will only be overturned if it is "patently wrong" or "divorced from the facts" in the record).

Second, the ALJ did not err by being skeptical of Weber's alleged symptoms based on her activities, including her vacation travels to warm-climate countries. Weber testified that heat triggers exacerbations of her MS symptoms even when she is indoors with air conditioning, and that on hot days, she "can't walk." (Id. at 44, 49.) But as the ALJ noted, Weber testified that she spent eight days in Greece after her alleged onset date in June 2011, and that she did some walking there even though by her own account, the weather was hot. (Id. at 23, 25, 56-57.) She also traveled to Mexico and the Caribbean after her alleged onset date. (Id. at 25.) The ALJ acknowledged Weber's testimony that she tried to stay out of the sun during those trips, but the ALJ also pointed out that Weber's "non-essential travel" to those destinations "detracts somewhat from her claims of debilitating symptoms[.]" (Id.) This is not a case where the record fails to demonstrate how a claimant's vacation travels were inconsistent with her alleged degree of physical limitation. *Cf. Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014). Nor is this a case where evidence shows Weber suffered from exacerbated symptoms during those trips, because as the ALJ pointed out, her neurologist noted that she "did well" during her stay in Mexico. (A.R. 25 (citing id. at 291).) In fact, Weber challenges the ALJ's reliance on her other activities, such as the fact that she can do household chores, but she does not specifically address the ALJ's reliance on her travel as a reason for doubting her alleged limitations. (See R. 12, Pl.'s Mem. at 14.) And even if the ALJ erred by finding Weber's household activities inconsistent with her allegations of chronic pain and fatigue, an ALJ's credibility assessment need not be flawless, and not all of

the ALJ's reasons for discounting symptom allegations must be valid as long as enough of them are. *See, e.g. Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009). Here, the ALJ provided enough valid reasons for finding Weber's symptom allegations less than fully credible.

## E.  Hypotheticals

Finally, Weber argues that the hypotheticals posed to the VE did not accurately reflect the extent of her limitations. (R. 12, Pl.'s Mem. at 14.) Specifically, she faults the ALJ for failing to include limitations based on her testimony that she can only walk two or three blocks at a time, can stand for only 20 minutes if she can brace against something, and cannot sit for more than an hour. (Id.) Ordinarily, a hypothetical question to the VE must include all limitations supported by the medical evidence to ensure that the VE understands the full extent of the limitations in matching the hypothetical RFC to available jobs. *See Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). But the ALJ is required to incorporate into the hypotheticals only those impairments and limitations that she accepts as credible. *See Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). Here, the ALJ did not find Weber's description of her walking, standing, and sitting limitations credible, so she was not required to include them in the hypothetical posed to the VE.

## Conclusion

For the foregoing reasons, Weber's motion is denied and the Commissioner's final decision is affirmed.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**